995 F.2d 234
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jerry Allen SILVA, aka Jesse Vega, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Kimbel LE MAUX, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Paul INRIG, Defendant-Appellant.
 Nos. 92-10006, 92-10007 and 92-10116.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Feb. 1, 1993.
Decided May 28, 1993.
As Amended Sept. 15, 1993.
 
 1
 Before FLETCHER, REINHARDT and NOONAN, Circuit Judges
 
 
 2
 MEMORANDUM*
 
 
 3
 Jerry A. Silva, Kimbel LeMaux, and Paul Inrig (appellants) appeal their convictions for conspiracy to possess and to possess with intent to distribute cocaine. They contend that the jury instructions on multiple conspiracies failed to protect their right to jury unanimity and that the prosecutor's argument invited conviction based upon a time-barred offense. Appellants also claim that reversal is required by the district court's refusal to admit defense evidence concerning the conduct and bias of a government investigator. Appellants further argue as grounds for reversal the government's failure to extend immunity to a potential defense witness, the admission of prejudicial evidence, and prosecutorial misconduct during closing argument. LeMaux also challenges his sentence on the grounds that the district court improperly considered conduct of which he was acquitted. We affirm the convictions and the sentence.
 
 
 4
 LeMaux's conviction on Count II for conducting a continuing criminal enterprise is considered in a separate opinion filed herewith.
 
 PROCEEDINGS
 
 5
 An indictment was filed in 1990 charging Silva, LeMaux, Carl Moore, John Moore, and Paul Inrig, among others, with one count of conspiring to possess cocaine and to possess cocaine with an intent to distribute. LeMaux was charged in Count II with operating a continuing criminal enterprise. LeMaux, the Moores and Inrig were charged in Count III with conspiracy to collect on debts owed LeMaux by extortionate means. As the result of plea agreements, Humberto Vega (aka David Posada), Gus Sand, Ramon Perez and John Moore testified for the government. The trial of the five remaining co-defendants lasted over a month. After the close of arguments, defendants moved for a mistrial based upon prosecutorial misconduct. The motion was denied. The jury found all of the defendants guilty on Count I and found LeMaux guilty on Count II. All of the defendants were acquitted of Count III.
 
 
 6
 Pre-Guidelines sentences were applied because the conspiracy ended in November 1987. Silva was sentenced to 20 years and Inrig received a 25 year term. The district court determined that the jury acquitted LeMaux of Count III on the basis of the statute of limitations only. The court considered the evidence of LeMaux's violent collection of drug debts admitted under Count III in sentencing him to 35 years. Timely notices of appeal were filed. The district court had jurisdiction of the matter under 18 U.S.C. § 3231 and we have jurisdiction pursuant to 28 § U.S.C. 1291.
 
 FACTS
 
 7
 The facts established at trial, reviewed in the light most favorable to the government, were as follows: Kimbel LeMaux operated a drug distribution network between 1982 and 1987. Paul Inrig and Jerry Silva, along with others, were involved in the network as distributors or debt collectors. Gus Sand was a one-time distributor for LeMaux who later began working for Humberto Vega, a cocaine smuggler employed by the Builes family of Medellin, Colombia. Sand arranged a meeting between LeMaux and Vega so that LeMaux could get access to Vega's large quantity of wholesale cocaine. The meeting was held sometime between August 1984 and April 1985 in a Beverly Hills hotel. Vega, Sand, and Ramon Perez, an ex-Miami police officer, attended the meeting together while LeMaux was accompanied by Inrig and Carl Moore. The parties agreed that Vega would supply LeMaux with cocaine for distribution in Northern California. An exchange of drugs occurred shortly thereafter. Approximately one month later Vega and Sand smuggled 500 kilograms of cocaine into the United States, a portion of which was driven to a LeMaux safehouse in Santa Rosa, California. Another smuggling by Vega and Sand resulted in a second delivery to the same safehouse where it was turned over to Inrig and LeMaux's brother Roger.
 
 
 8
 Silva, living in the Sierra foothills, was one of LeMaux's distributors. Carl Moore delivered cocaine to Silva's home regularly in exchange for money. Silva repackaged the cocaine into smaller units for distribution. Cocaine deliveries slowed and eventually stopped sometime in 1987 after Carl Moore told Silva that he feared the operation was under investigation. Carl Moore and his son John were not only distributors, but also debt collectors for LeMaux.
 
 ANALYSIS
 A. Jury Unanimity
 
 9
 The defendants contend that a specific unanimity instruction was necessary on Count I because the evidence indicated the existence of two separate conspiracies, their individual objects being importation and distribution. Because some jurors could have voted to convict based upon the importation conspiracy while others relied upon the distribution conspiracy, defendants contend that the jurors should have been instructed that they must be unanimous as to the existence of a single conspiracy. Because defendants did not request a specific unanimity instruction, we review only for plain error. United States v. Boone, 951 F.2d 1526, 1541 (9th Cir.1991).
 
 
 10
 In this case the court charged the jury with a general unanimity instruction. A general unanimity instruction usually suffices to safeguard a defendant's right to a unanimous verdict. United States v. Payseno, 782 F.2d 832, 835 (9th Cir.1986). A specific instruction is only necessary where a " 'genuine possibility' of juror confusion exists." United States v. Gilley, 836 F.2d 1206, 1211 (9th Cir.1988) (quoting United States v. Echeverry, 719 F.2d 974, 975 (9th Cir.1983)). Confusion may arise in particularly complex cases where jurors may reasonably find the existence of different facts. United States v. Frazin, 780 F.2d 1461, 1468 (9th Cir.), certs. denied, 479 U.S. 833, 479 U.S. 844 (1986).
 
 
 11
 Because of the factual complexity of this case and the introduction of evidence tending to prove the existence of an uncharged importation conspiracy, a general unanimity instruction probably would not have been sufficient to protect the defendants' rights. The district court in this case, however, issued more than the basic unanimity instruction. The court also instructed that, to convict, the jury must find that the government proved the existence of "the single overall conspiracy alleged in Count I of the Indictment" and that each defendant was a member of that particular conspiracy. Count I of the indictment charged the defendants with conspiring to distribute and possess with intent to distribute cocaine. Defendants argue that the language charging them with conspiracy to possess with intent to distribute is broad enough to embrace the importation conspiracy. But possession with intent to distribute and importation are separate crimes, the former having to do with holding the contraband and the latter having to do with obtaining it. The instruction given by the court in this case conforms to the requirements of United States v. Mastelotto, 717 F.2d 1238, 1247-48 (9th Cir.1983). The jury was instructed that it must be unanimous as to the single conspiracy charged in Count I.
 
 
 12
 During closing arguments the prosecutor suggested that evidence of the meeting between Vega and LeMaux alone was sufficient to sustain a guilty verdict if the jury concurred that it resulted in an agreement to import cocaine. In fact the importation scheme of Vega--to bringing of cocaine from Colombia to Mexico to the United States--was clearly a separate enterprise that ended up supplying some of its imports to the California defendants. The meeting the prosecutor focused on was the prelude to delivery of the goods to LeMaux. Defense counsel twice objected to the prosecutor's argument and twice his objection was overruled. Under the circumstances, the court should have more thoroughly informed the jury of the nature of the conspiracy charged. Any impropriety in the prosecutor's argument and the court's failure to control it, however, was harmless. The evidence of the defendants' participation in a conspiracy to possess and possess with intent to distribute cocaine was overwhelming.
 
 B. Statute of Limitations
 
 13
 As just discussed, the prosecutor argued during closing that the jury could convict the defendants of Count I on the basis of the meeting between Vega and LeMaux alone. The defendants were indicted on April 6, 1990. The five-year statute of limitations thus encompassed all acts occurring since April 6, 1985. The latest date witnesses gave for the Vega-LeMaux meeting was January 1985, several months beyond the statute of limitations. Arguably, the emphasis on the meeting obscured the critical fact that the meeting explained the subsequent deliveries of Colombian cocaine to LeMaux. Improper prosecution argument, even if it were proved, only demands reversal where the error was sufficiently gross as to prejudice the defendant and was not neutralized by the court's instructions. United States v. Flake, 746 F.2d 535, 542 (9th Cir. 1984), cert. denied, 469 U.S. 1225 (1986). The court charged that the jury must acquit if left with a reasonable doubt that the conspiracy continued in existence through April 6, 1985. The court's instructions neutralized the prosecutor's misleading argument. Id.
 
 C. Exclusion of Evidence
 1. Evidence of Intimidation
 
 14
 At trial the defendants sought to introduce testimony by several witnesses that they had been intimidated by Gary Neal, the U.S. Customs Agent primarily responsible for the case, in an effort to get them to testify for the government. None of the proposed witnesses actually testified for the government. The district court ruled the evidence inadmissible under Rule 403: the proposed evidence bore on the government treatment of non-witnesses. The court found that the evidence was not sufficiently probative of the agent's conduct toward the witnesses who did testify for the prosecution. To permit the introduction of the evidence would cause undue delay and confusion. The district court's weighing of probative value against prejudicial effect is reviewed for abuse of discretion. United States v. Kessi, 868 F.2d 1097, 1107 (9th Cir.1989). Abuses of discretion require reversal only where the error more likely than not affected the verdict. United States v. Chu Kong Yin, 935 F.2d 990, 994 (9th Cir.1991).
 
 
 15
 Review of the offers of proof made by the defendants reveals that much of the alleged intimidation involved proper investigative techniques. Because much of the proffered evidence failed to show improper behavior by Neal, its probative worth in questioning the credibility of those who were government witnesses was slight. The evidence did not prove that Neal approached the government witnesses in the same manner. Each of the government witnesses was extensively impeached by cross-examination concerning the deals struck with the government for testimony against the defendants. The district court properly noted that the government would be given the opportunity to respond to the evidence by proving Neal's history in conducting investigations and the propriety of his comments to the potential witnesses. The danger of confusing the issues and causing undue delay was substantial. Considering the slight probative worth of the evidence, the court's decision to exclude the evidence under Rule 403 was not an abuse of discretion.
 
 2. Evidence of Bias
 
 16
 Defendants sought to introduce evidence of Agent Neal's involvement in a 1976 investigation of LeMaux for dealing in marijuana. Though LeMaux was convicted of the charge, the conviction was reversed on appeal due to false statements in the search warrant affidavit. Defendants wanted to use this evidence to prove a motive by Agent Neal to persecute LeMaux. The evidence of Neal's participation in the earlier investigation should have been allowed. The proffered evidence bears on the possible bias of Agent Neal and could have been used to impeach his testimony. Bias is a favored form of impeachment which may be proven by extrinsic evidence. United States v. Abel, 469 U.S. 45, 52 (1984). The evidence would not have been cumulative since Neal was not otherwise significantly impeached.
 
 
 17
 The error in excluding the evidence, however, was harmless. Agent Neal was a relatively minor witness in the proceedings. The substantive evidence in the case was presented primarily by associates and co-conspirators of the defendants. As their testimony would not have been significantly tainted by the proffered evidence of Neal's bias, the abuse of discretion in excluding the evidence did not likely affect the verdict. See Chu Kong Yin, 935 F.2d at 994. The defendants were not denied the opportunity to present a defense.
 
 3. Comment Upon Excluded Evidence
 
 18
 Defense counsel argued in closing that Agent Neal had coerced prosecution witnesses into lying and coached them as to how they should testify. The prosecution responded by stating that the defense presented no evidence of intimidation of witnesses and no explanation as to why federal authorities might persecute LeMaux and his associates. Defendants claim this argument was prosecutorial misconduct necessitating reversal.
 
 
 19
 Comment upon the lack of evidence where such evidence has been excluded at trial may be improper, especially where the court refuses to admit the evidence under Rule 403. A prosecutor should not take undue advantage of the court's ruling in arguing the failures of defense counsel. Improper prosecution argument demands reversal, however, only where the error was sufficiently gross as to prejudice the defendant and was not neutralized by the court's instructions. Flake, 746 F.2d at 542. In light of the substantial evidence presented by the defendants' associates and co-defendants, any misconduct on the part of the prosecutor in commenting upon the lack of evidence concerning Agent Neal was not sufficiently gross as to prejudice the defendants.
 
 D. Refusal of Immunity to Defense Witness
 
 20
 Roger LeMaux was a named defendant against whom the charges were dropped just prior to trial. Several of the government witnesses testified to events at which Roger was allegedly present. The defense called Roger to rebut some of this testimony but he invoked his Fifth Amendment right against self-incrimination while on the stand. The government refused to extend use immunity to Roger so that he might testify, and the court refused to compel the offer of immunity.
 
 
 21
 The government may only be compelled to extend immunity where the fact-finding process is intentionally distorted, denying the defendant a fair trial. United States v. Westerdahl, 945 F.2d 1083, 1086 (9th Cir.1991). The defendant must prove both that the witness's testimony is relevant and that the government distorted the fact-finding process by denying immunity. Id.
 
 
 22
 Where the potential witness offers testimony to directly rebut that produced by the government through immunized witnesses or those testifying because of a plea bargain, the government must offer immunity to the defense witness to avoid distorting the fact-finding process. Westerdahl, 945 F.2d at 1087. Where the government has distorted the fact-finding process, we must then determine whether the defendants have been denied their due process rights.
 
 
 23
 The defense sought the testimony of Roger LeMaux to rebut that presented by government witness Peter Newton that Kimbel LeMaux paid him $200,000 in cash for the wood rights to property owned by Newton. Newton did not testify with the benefit of immunity or a plea bargain. Under Westerdahl there was no distortion of the fact-finding process as to Roger Lemaux's proffered testimony concerning Peter Newton.
 
 
 24
 Roger LeMaux was also called to testify to contradict Gus Sand's testimony that he had delivered cocaine to Roger and Inrig at a LeMaux safehouse in Santa Rosa. Unlike Newton, Sand's testimony was given pursuant to a plea agreement. Under Westerdahl, remand is generally appropriate for a hearing in the district court to determine whether the defendants received a fair trial. Westerdahl, 945 F.2d at 1087. The circumstances of this case are unusual, however, and allow us to consider whether the defendants were denied their rights as a matter of law at this time. The contradiction between Sand's testimony and that proffered for Roger scarcely approaches the nature of the conflict which prompted a remand in Westerdahl. Considering the extensive evidence of numerous drug transactions involving each of the defendants, the failure to offer Roger immunity does not meet the Westerdahl standard. The defendants were not denied a fair trial.
 
 E. Evidence of Money-Laundering Activities
 
 25
 The government presented several theories at trial as to how the defendants laundered their drug money. An attorney, Peter Newton, testified that LeMaux paid him $200,000 in cash for the wood rights to some property owned by Newton. Accountants also testified about $450,000 improperly added into the books of COSOL Marine, a boat company partially owned by LeMaux. The defendants other than LeMaux objected to the evidence and moved for severance. The district court overruled the objection and denied severance. The admission of evidence is reviewed for abuse of discretion. Kessi, 868 F.2d at 1107. Likewise, denial of severance is reviewed for abuse of discretion. United States v. Cuozzo, 962 F.2d 945, 949 (9th Cir.), cert. denied, 113 S.Ct. 475 (1992).
 
 
 26
 In a conspiracy prosecution the government must prove both that the conspiracy existed and that each defendant was a member. United States v. Garza, 980 F.2d 546, 552 (9th Cir.1992). Evidence of the alleged money-laundering activities was admissible to prove the existence of the conspiracy. United States v. Collins, 764 F.2d 647, 654 (9th Cir.1985). Because Silva, Inrig and LeMaux were all charged as part of the same conspiracy, the evidence was admissible against all. The district court did not abuse its discretion in admitting the evidence or denying the motions to sever.
 
 
 27
 F. Evidence of Extortionate Collection of Credit
 
 
 28
 LeMaux and Inrig, along with two others, were charged in Count III with conspiracy to collect credit by extortionate means. The jury acquitted all defendants of Count III. The defendants argue that the government knew it could not sustain its burden on Count III and only prosecuted that charge to gain admission of otherwise irrelevant evidence concerning the defendants' alleged violence in collecting drug debts. Defendants claim the improper prosecution on Count III requires reversal on the other counts.
 
 
 29
 This argument involves factual issues regarding the prosecution's state of mind. At no time in the district court did the defendants raise the issue of the effect of Count III evidence on Counts I and II. Issues not raised in the trial court generally cannot be raised for the first time on appeal. United States v. Flores-Payon, 942 F.2d 556, 558 (9th Cir.1991). The defendants do not satisfy any of the exceptions to this general waiver rule. Id. The issue has been waived.
 
 
 30
 G. Prosecutorial Misconduct in Closing Arguments
 
 1. Vouching for Witnesses
 
 31
 During rebuttal at closing argument the prosecutor stated that he was personally offended by implications of defense counsel that he had suborned perjury. He further argued that the credibility of government witnesses was supported by the failure of defendants to offer evidence concerning filed tax returns and Agent Neal's alleged misconduct. A prosecutor may not vouch for the credibility of his witnesses by putting his prestige behind them or by indicating that their testimony is supported by evidence not presented in court. United States v. Simtob, 901 F.2d 799, 805 (9th Cir.1990). A prosecutor may respond, however, where defense counsel has questioned his integrity by alleging that the prosecution suborned perjury and made false statements to the jury. Flake, 746 F.2d at 541. The prosecutor's comments, brief and limited to defending his own integrity, were a proper response to defense allegations that the government had threatened and coached its witnesses to lie.
 
 
 32
 The prosecutor's statement that the credibility of the government witnesses was supported by a lack of evidence presented by the defense was likewise not improper. Improper vouching occurs where the prosecutor indicates that the government is aware of information which further proves the defendant's guilt and is outside the jurors' knowledge. See United States v. Roberts, 618 F.2d 530, 533-34 (9th Cir.1980). Arguing inferences from a lack of evidence does not imply that the government has additional knowledge apart from what was presented in court.
 
 2. Failure to Introduce Tax Returns
 
 33
 During trial the government sought to introduce documentary evidence that Inrig and Silva did not file tax returns from 1983 to 1988 only to have the evidence excluded by the court. The prosecutor argued during closing that these defendants had not introduced their tax returns into evidence because they had not filed any. Following a request by defense counsel, the court instructed the jury that there was no evidence presented as to whether or not the defendants filed tax returns and that they need not be concerned with the question. This instruction was a clear rejection of the prosecutor's argument and effectively neutralized any prejudice caused by the comment. See United States v. Potter, 616 F.2d 384, 392 (9th Cir.1979), cert. denied, 449 U.S. 832 (1980).
 
 3. Explaining Absence of Witnesses
 
 34
 During closing arguments defense counsel questioned why the government failed to call the two primary victims of Count III, Bart Valerio and Ashley Brigsdale, who allegedly had been beaten by Carl Moore in an effort to extract the money owed LeMaux for fronted drugs. In rebuttal the prosecutor pointed to the evidence that these two potential witnesses had been severely injured by the defendants and represented that "they are scared."
 
 
 35
 A prosecutor may not argue facts which are not part of the evidence presented to the jury. United States v. Gray, 876 F.2d 1411, 1417 (9th Cir.1989), cert. denied, 495 U.S. 930 (1990). The prosecutor, however, has wide latitude during closing to argue all reasonable inferences from the evidence. Id. The representation that Valerio and Brigsdale were afraid to testify was a reasonable inference from the testimony presented. Furthermore, the evidence of the beatings of Valerio and Brigsdale concerned Count III of which the defendants were acquitted. It cannot be said that any misconduct the prosecutor's statement may represent more likely than not affected the verdict on Count I. See Simtob, 901 F.2d at 806; Potter, 616 F.2d at 392.
 
 4. Representing Monetary Value of Cocaine
 
 36
 Several witnesses testified at trial as to the monetary value of cocaine. John Moore testified that the value of a kilogram of cocaine between 1983 and 1987 averaged approximately $30,000. Other witnesses testified as to how much cocaine they delivered and the amount of money they received in exchange. During closing defense counsel argued that the government witnesses had been inconsistent, noting that those who were paid for the cocaine should have received significantly more than they claimed, considering the high value of the drug. The prosecutor discredited the argument, stating that those who testified as to how much they received upon delivering cocaine to LeMaux or his associates were given only the $4,000 to $7,000 wholesale value of a kilogram as opposed to the $30,000 retail value. The government improperly attributed this wholesale value to the testimony of John Moore.
 
 
 37
 The prosecutor's statement was supported by the evidence, although not attributable to the source named by the government. Both the prosecutor and the court repeatedly reminded the jury that arguments were not to be considered evidence and the jurors should depend upon their own memory of the testimony. We conclude that this mistake, neutralized by the court, did not prejudice defendants' rights. See Potter, 616 F.2d at 392.
 
 5. Witness's Investigation of LeMaux
 
 38
 Vega, Sand and others testified at trial to the initial meeting that occurred in Beverly Hills between Vega and LeMaux to arrange for the importation of cocaine to be distributed in northern California by LeMaux and his organization. During closing the prosecutor argued that Vega, who had testified to connections with the Medellin drug cartel, would not have met with LeMaux without investigating his credentials to be certain he was a reliable and substantial drug dealer. Vega did not testify that he had conducted any such investigation. The government contends that this argument was a reasonable inference from the evidence. Considering Vega's background and Sand's history with LeMaux, it is reasonable to assume that Vega would question Sand about LeMaux's capabilities before risking a whole new distribution scheme. A high-level member of a Colombian cocaine cartel would not have jeopardized his imports, his bosses, and himself by dealing with an unknown. The argument was not improper. See Gray, 876 F.2d at 1417 (finding the inference that the defendant had been hiding in Mexico appropriate from the evidence that he was he was arrested in Mexico three months after a warrant had been issued).
 
 H. LeMaux's Sentence
 
 39
 The district court considered the evidence of LeMaux's violent collection of drug debts in sentencing him though he was acquitted of Count III. The district court found that the conspiracy ended prior to November 1987 and so entered the defendants' sentences pursuant to pre-guideline law. We held in United States v. Brady, 928 F.2d 844, 851 (9th Cir.1991), that a court cannot consider conduct for which a defendant was acquitted in imposing sentence. The holding, however, is limited to sentences imposed under the guidelines. Pre-guidelines law gives the district court the authority to consider conduct which did not result in a conviction when sentence is imposed for acts occurring prior to the effective date of the sentencing guidelines. See Walker v. Endell, 850 F.2d 470, 476-77 (9th Cir.1987), certs. denied, 488 U.S. 926, 488 U.S. 981 (1988); United States v. Lowe, 654 F.2d 562, 565-66 (9th Cir.1981); United States v. Morgan, 595 F.2d 1134, 1135-37 (9th Cir.1979). We are bound by that authority in this case and must affirm the sentence.
 
 
 40
 The judgments and sentences are AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Cir.R. 36-3